**In re Catherine Duffy PETIT, Debtor.**

No. 93–20821.

United States Bankruptcy Court,
D. Maine.

March 12, 2003.

Steven Notinger, Nashua, NH, Chapter 7 Trustee.

Stephen G. Morrell, Brunswick, ME, Steven E. Cope, Cope and Cope, Portland, ME, for former Chapter 7 Trustee, Joseph V. O'Donnell.

· S. Peter Mills, Wright & Mills, P.A., Skowhegan, ME, John Boyajian, Bayajian,

Harrington & Richardson, Providence, RI, for Trustee Notinger.

Stephen F. Gordon, Gordon & Wise, Boston, MA, for debtor.

### MEMORANDUM AND ORDER SETTING COMPENSATION

ARTHUR N. VOTOLATO, Bankruptcy Judge.[*]

In this long and contentious bankruptcy case, some background is necessary to put the following discussion about fees in proper perspective. The origin of this legend, which precedes Catherine Petit's involuntary bankruptcy in 1993, is most notable for Petit's post-petition crime spree,[1] and the damage to the administration of this case by the attorney for the Debtor's friend and main co-conspirator, Paul Richard. Ironically, in the early stages of her fall from substantial citizen to convicted felon, and long before she inflicted so much damage upon others, Catherine Petit was herself fleeced out of several millions of dollars by a gang of Petit groupies, where Bernstein Shur malpractice settlement proceeds of $3,900,000 were disbursed to her "friends, advisors, and attorneys," leaving Petit with less than $190,000. It was the poor handling, early on, of this scenario which prompted then Chief District Judge Gene Carter's scathing but accurate assessment of the substandard manner in which this case was being addressed by the professionals, and under-supervised by the Bankruptcy Court. See Petit v. New England Mortgage Servs. Inc. (In re Petit), 182 B.R. 64, 72 (D.Me.1995). Although Judge Carter's comments and admonitions were directed only to the Bernstein Shur situation, he was also somewhat clairvoyant—i.e., even before the ink was dry on his order affirming the appointment of a Chapter 11 Trustee, many of the same actors were embarking on a scheme that would double the magnitude of the misconduct which incurred his wrath in the first place. What this is all leading up to is that this sorry tale was probably made as bad as it is by the apathy and inattention of Court-appointed professionals to the mischief that was ongoing, literally under our noses. I say *our* noses because this Court shares blame with those being admonished here, for not being more pro active in overseeing the professionals and in not formally ordering closer monitoring of a Debtor who absolutely needed closer monitoring. In classic Keystone Cop fashion (except that nothing here is funny), much of the work of the fiduciaries in this case has consisted largely of closing doors after the damage has been done.

In any event, here are some highlights which make this whole episode the disaster that it is: The case has seen three trustees and many professionals, had varied chapter status for nearly 20 months, and finally in October 1995 ended up in Chapter 7 for good. Things at first appeared to be proceeding normally, until Peter Fessenden, Esq., the original Trustee who was aggressively performing his statutory duties, abruptly quit the job after receiving threats by counsel for Paul Richard, one of Fessenden's prime targeted defendants. Specifically, Joseph S.U. Bodoff, Esq., promised Fessenden that he would be sued and held personally and financially responsible (for what, we still don't know) unless all legal action against his client was dropped, and unless Fessenden dismissed

---

[*] Of the District of Rhode Island, sitting by designation.

1. It is not often that a bankruptcy debtor gets to illegally acquire, conceal, and dissipate eight million dollars while her case is pending and presumably being administered in the bankruptcy system.

his adversary proceeding brought against Petit[2] to deny her discharge. Getting really up close and personal, Bodoff told Fessenden "we'll take your house" unless Fessenden backed off. That this comment was made in the presence of Mrs. Fessenden eliminated any possibility that Mr. Fessenden might reconsider his decision to resign. It was also apparent that other things were said during the encounter, but Fessenden, admittedly and visibly intimidated, refused to go into detail, even when pressed by the Court at a hearing on April 30, 1996. Bodoff also did a masterful job avoiding *any* specifics when queried on this subject, again *only* by the Court.[3] That single confrontation which left the estate without a Trustee, halted all the momentum, removed all scrutiny from the Debtor by diverting the attention of professionals to obtaining new professionals, and otherwise seriously derailed the orderly progress of the case—a disruption from which the estate never recovered.[4] By any standard, Bodoff could not have scored higher on the accomplishment of his mission, which was totally out of bounds both morally and professionally.

Pursuant to 18 U.S.C. § 3057(a), I reported the incident to the United States Attorney for the District of Maine, to investigate whether a bankruptcy crime or other misconduct had been committed, and to report to the Court, in writing, the result of his inquiry. Time passed, and nothing happened. After my early polite requests, and later not so polite demands for a substantive answer were ignored, the Maine U.S. Attorney finally responded one day by telephone: "we're not taking any action, and we're not telling you why." Add to this the fact that Mr. Bodoff was never interviewed by the U.S. Attorney, the matter takes on an odor all of its own. Besides reflecting unfairly on the many not so arrogant Department of Justice agents, this autocratic behavior also sends the unfortunate message *DON'T BOTHER US*, to anyone inclined to obey 18 U.S.C. § 3057(a), which requires:

> Any judge, receiver, or trustee having reasonable grounds for believing that any violation under chapter 9 of this title or other laws of the United States relating to insolvent debtors, receiverships or reorganization plans has been committed, *or that an investigation should be had in connection therewith,* shall report to the appropriate United States attorney all the facts and circumstances of the case, the names of the witnesses and the offense or offenses believed to have been committed. Where one of such officers has made such report, the others need not do so.

18 U.S.C.A. § 3057(a) (emphasis added). These vignettes partially explain the Court's frustration and dissatisfaction with some of the performances in this case, and why this incident has been so benignly ignored.

Turning to more predictable sources of misconduct, i.e., the Debtor's, the principal asset of this estate has always been a claim against Key Bank, which was pending in the Maine State Courts since 1986. Over

---

2. Mr. Bodoff has never appeared as counsel for Petit.

3. In the face of such unscrupulous conduct, the silence of all others, including the U.S. Trustee, and the U.S. Attorney, still is a mystery and an embarrassment that, hopefully, will not be seen again.

4. Given the consequences of Bodoff's willful interference with the administration of a federal bankruptcy case, it is most distressing that the U.S. Trustee, the successor case Trustees, and all other professionals were willing to condone or ignore such underhanded conduct. This kind of collegiality has no place in an adversary legal system.

time, all counts of the Complaint were dismissed, except one alleging tortious interference with the Debtor's contractual relationship with another bank. As this asset was being administered *in the Bankruptcy Court,* but while the professionals were ineptly trying to cure the Fessenden resignation and counsel conflict problems, the Debtor, with the help of Paul Richard and others, began, on a very large scale, illegally selling shares of the same cause of action to (mostly elderly) Maine residents. The ruse was that people were induced to advance money to finance "Petit's litigation" against Key Bank, with promises of extravagant returns on their investments, plus really big bonuses for everybody when the matter was concluded. The sales pitch included promissory notes signed by Petit or others on her behalf, as investors were assured that success in the end was a virtual certainty, and that the final recovery would be in the many millions of dollars.[5] Over several years the Petit group conned unwitting investors out of nearly eight million never to be seen again dollars, all of which went to Petit and her entourage.

As Petit was executing this grand scam,[6] she kept insisting here that a $1.75 million offer by Key Bank should not be accepted, while most other interested parties urged approval of the compromise. Because of the repeated and persuasive representations of Petit's counsel as to the worth of this asset, several experts were hired to independently evaluate the claim, and a lot of time and expense were incurred obtain-

ing and hearing their opinions. In June 1999, as the jury in the government's criminal case against Petit, et als, was deliberating, Trustee Notinger accepted Key Bank's offer,[7] and after extensive hearings on the Debtor's objection, the settlement was approved.

Now, with $1,944,657 on hand, the Trustee estimates that with fee applications totaling $793,000, plus the claims of the Internal Revenue Service, and restitution owed to the Department of Justice, $4,000,000 of unsecured creditors can expect a dividend of about 16%. With this background, the Court addresses the issue of professionals' compensation.

### THE FEE APPLICATIONS

The following requests have been filed:

(1) Steven Notinger, Esq., Chapter 7 Trustee—Interim Application in the amount of $29,494 and expenses of $251. Mr. Notinger requests $20,000, on account, at this time;

(2) John Boyajian, Esq., Attorney for Trustee Notinger—Interim Application in the amount of $54,703 and expenses of $3,153;

(3) Stephen Morrell, Esq., Attorney for the former Chapter 7 Trustee, Joseph V. O'Donnell, for payment of previously approved compensation of $3,799 and expenses of $115. Mr. Morrell also has a final fee application covering the period December 1, 1995 through April 23,

---

5. Petit, Paul Richard, and their illicit sales force, were selling interests in the lawsuit even after dismissal of the last remaining count of the Key Bank complaint, while the matter was literally hanging by a thread in the Maine Supreme Court.

6. How criminal activity of such magnitude could go unnoticed and/or unquestioned over such a long time is incomprehensible.

7. This was a timely move, given the multiple guilty verdicts the very next day. Petit, who was sentenced to serve 188 months and ordered to make restitution of nearly eight million dollars, would have been the Trustee's main witness in the Key Bank trial.

1999, for $108,148 and expenses of $3,407;

(4) Peter Fessenden, Esq., Chapter 7 and Chapter 11 Trustee—Final Fee Application for the period March 17, 1995 through December 7, 1995, requesting $17,315 and expenses of $1,204;

(5) Steven Cope, Esq., Special Counsel to Trustee O'Donnell—Final Fee Application covering the period January 22, 1996 through June 17, 1997, in the amount of $12,863 and expenses of $582;

(6) S. Peter Mills, Esq., Special Counsel for Trustee Notinger—Final Fee Application for the period March 14, 1998 through February 8, 2000, requesting $99,085 and expenses of $2,051;

(7) Duane D'Agnese, Accountant for Trustee Notinger—Interim request of $13,040;

(8) John S. Campbell, Esq., requesting $21,928, as a creditor making a substantial contribution to the case under 11 U.S.C. §§ 503(b)(3)(B) & (b)(3)(D);

(9) Stephen Gordon, Esq., attorney for the Debtor, Final Application for $408,955 and expenses of $13,777.

Total fee requests and expenses: $793,870.

With most litigation and case administration issues completed, we finally have the asset/claims picture, and the cash available for distribution to unsecured creditors.

### DISCUSSION

The applications have been reviewed using the lodestar approach and the *Johnson* criteria, as they apply to the facts in this case. *See King v. Greenblatt,* 560 F.2d 1024 (1st Cir.1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978) (adopting the factors set forth in *Johnson*

*v. Georgia Highway Express,* 488 F.2d 714 (5th Cir.1974)); *Furtado v. Bishop,* 635 F.2d 915 (1st Cir.1980); *Garb v. Marshall (In re Narragansett Clothing Co.),* 210 B.R. 493, (1st Cir. BAP 1997); *In re Swansea Consol. Resources, Inc.,* 155 B.R. 28 (Bankr.D.R.I.1993); *In re Almacs, Inc.,* 178 B.R. 598 (Bankr.D.R.I.1995).

The lodestar is calculated by multiplying the hours spent, times the hourly rate, subject to reasonableness, *Furtado,* 635 F.2d at 920, and when that amount is determined, the court may adjust the number up or down based on other factors, including the result and/or benefit to the estate of the services performed by the professional. *Boston & Maine Corp. v. Moore,* 776 F.2d at 7; *In re Casco Bay Lines, Inc.,* 25 B.R. 747, 756 (1st Cir. BAP 1982); *Swansea,* 155 B.R. at 31; *Garb v. Marshall (In re Narragansett Clothing Co.),* 210 B.R. 493, 497–98 (1st Cir. BAP 1997). Determining the hours reasonably spent involves the consideration of several factors, and "the hours actually expended by an attorney do not necessarily constitute the hours reasonably expended. The court should review the work done to see whether counsel substantially exceeded the bounds of reasonable effort.'" *Casco Bay Lines,* 25 B.R. at 755 (*quoting, Pilkington v. Bevilacqua,* 632 F.2d 922, 925 (1st Cir.1980)).

These guidelines, applied to the facts in this case, produce the following results:

The interim application of Steven Notinger, Esq., as Trustee is allowed, *on account,*[8] in the amount of $20,000.

John Boyajian, Esq., is allowed $41,027, 75% of his request, and expenses are allowed as filed—$3,153, *on account.*

---

8. This allowance, together with *all* other *on account* awards made herein, will be recon-

sidered when final applications for compensation are heard.

Peter Fessenden, Esq.'s request as attorney for himself as Chapter 11 and as Chapter 7 Trustee is allowed in the amount of $15,000, *on account.*

■ Steven Cope, Esq., was hired as special counsel to Trustee O'Donnell to investigate the propriety of the disbursement of the proceeds of Petit's malpractice settlement with the Bernstein Shur law firm. Although no worthwhile or collectible causes of action were discovered, this work had to be done and Mr. Cope did so cost effectively. His Application is allowed as filed, *on account,* in the amount of $12,862 and expenses of $581.

■ Duane D'Agnese, the accountant for Trustee Notinger, examined the tax consequences of the Key Bank settlement, analyzed the IRS $1.3 million pre-petition claim which was reduced to $250,000, and prepared tax returns for the estate. Mr. D'Agnese's services provided a tangible and quantifiable benefit to the estate, his application is reasonable and is allowed as filed, *on account,* in the amount of $13,040.

■ S. Peter Mills, Esq., requesting $99,085, was hired primarily to evaluate the proposed Key Bank settlement, examined over 500 notebooks of information, spent many hours interviewing Ms. Petit and several other potential witnesses, and researched a number of legal issues. He also testified at length in support of the Trustee's motion to compromise the Key Bank lawsuit. Considering the asset/claims picture, the requests of other applicants whose involvement and contribution in the case substantially exceeds that of Mr. Mills, the initially narrow purpose for which he was hired, and considering the value of his services to the estate— all these factors render this application too pricey, and it is allowed in the amount of $75,000, *on account.* This award also recognizes Mr. Mills' alternate charge to be Key Bank trial counsel, a task which never materialized, as all eyes were always on settlement.[9]

■ Stephen Morrell, Esq.'s request covers his entire tenure as Trustee's counsel (December 1, 1995 through April 23, 1999). A threshold problem with this application is that Mr. Morrell spent significant time prosecuting many adversary proceedings under the Maine Uniform Fraudulent Transfer Act, with absolutely no benefit to the estate, and which were eventually abandoned and assigned to the United States. An assessment of the probable value of a cause of action is appropriate before investing large amounts of billable time in worthless claims. See *In re Blue Grotto, Inc.,* 243 B.R. 602 (Bankr.D.R.I.2000). Also, many of the services described are really trustee duties, and are not sufficiently detailed to qualify as attorney time. There are many such cryptic entries, with no basis upon which to conclude that the services are properly chargeable as legal services. While professionals are occasionally allowed to supplement their original papers, it is the applicant's duty to put his/her best foot forward the first time, especially here, where there has been plenty of time and opportunity to perfect the applications. See *In re Armstrong Store Fixtures Corp.,* 139 B.R. 347, 350 (Bankr.W.D.Pa.1992).

Of even greater concern however, is the extensive delay and unproductive litigation (during a critical time) generated by the belated revelation that Mr. Morrell's firm had previously represented Key Bank.[10]

---

9. A fact clearly obvious to Key Bank, as well.

10. This issue, incidently, was not raised by the Applicant, but by the Debtor, and calls into question the veracity, or at best the accuracy of the applicant's affidavit of disinterestedness. According to Mr. Morrell the inordi-

After lengthy hearings on the Debtor's motion to disqualify, it was determined that a conflict did exist and that Mr. Morrell and his firm should be removed as to Key Bank issues. This resulted in a long, expensive, and exasperating search for new counsel, wherein no less than five replacement candidates were recommended by the Trustee, none of whom could qualify, also because of conflicts. A modicum of due diligence by Morrell or the Trustee before proposing all of these connected lawyers would have prevented a great deal of employment litigation, and would have allowed the focus to be where it should have been—on the Debtor.

Both the United States Trustee (AUST) and Trustee Notinger urge that Morrell's application be allowed as requested, pointing out that he was instrumental in obtaining the original $1.75 million offer from Key Bank.[11] The AUST also notes that Morrell did not bill the estate for any of the time regarding his firm's conflict problems, and this was insightful. Overall, the harm to the estate in time and expense generated by the late disclosure, his firms' partial disqualification, the ensuing unnecessary litigation over successor counsel, and Mr. Morrell's distraction from and inattention to the Debtor's criminal activity during his watch, weigh heavily here. All things considered, a reduction of at least 35% is in order, *see In re Smuggler's Beach Properties, Inc.*, 149 B.R. 740, 745 (Bankr.D.Mass.1993), and fees are allowed, *on account*, in the amount of $70,296 and expenses of $3,407. The Trustee is also authorized to disburse previously awarded fees and expenses in the amount of $3,914.

■ Next is the application of Stephen Gordon, Esq., Petit's bankruptcy attorney throughout the case, who requests total compensation and expenses of $793,870. Mr. Gordon has been a zealous advocate, often taking difficult and unpopular positions, appealing many adverse rulings and decisions.[12] The Debtor's misconduct and her penchant for meritless litigation have been costly to the estate, and since most of the services performed by Mr. Gordon were on Petit's personal behalf, he may not be compensated from estate assets for any of that work.

Gordon has previously been paid $306,000 by Ms. Petit, and the United States Attorney calculates that over $220,000 of the $306,000 is traceable to Petit's fraud. (Are we to assume therefore, that $86,000 came from legitimate sources?) This request drew opposition from the United States Department of Justice, the AUST, the Chapter 7 Trustee, New England Business Association, New England Mortgage Services Co., and John Campbell, Esq., but at the conclusion of the hearing on the application, the parties, wishing to discuss settlement, requested a continuance. After some time, all of the original objectors, except John Campbell, Esq., recommended that Gordon be allowed final compensation of $80,000 and expenses of $13,777. At a lengthy evidentiary hearing, the proponents of the compromise explained that Gordon billed over $252,000 for matters relating to the Key Bank litigation, and that he played a pivotal role in keeping the offer alive. It was also noted that Gordon provided essential services during the dark days of the appeal to the Maine Supreme Court, which reversed the lower court's dismissal of the

---

nate amount of time required to even identify conflict problems as they were repeatedly raised was due to the ineffective conflict check system used by his firm.

11. This, of course, is an item for which many people claim credit.

12. All seven of Gordon's/Petit's appeals were denied.

only remaining count of the complaint, and it was this turnaround which literally raised the Key Bank claim from the ashes.

The Department of Justice also supports the compromise, and while Assistant U.S. Attorney Frederick Emery acknowledges that Gordon was paid more than $220,000 from the fruit of the Debtor's criminal activity, he believes that Gordon did not know and, more importantly, could not reasonably have known the source of the funds used to pay him. As to this, I disagree completely with Mr. Emery. Gordon described at length and in detail his relationship with the Debtor, insisting that he had no clue as to what she was doing, and that in the end "he was her largest victim." Mr. Gordon's advocacy skills and the level of sophistication with which he does his work belie that contention. Without deciding whether he had actual knowledge of what the Debtor was up to, it would be more than naive to say that Gordon *should not have known* what was going on, given all that *was* going on. Red flags were everywhere: (1) As far back as 1995, Poulos/Campbell were reporting that the Debtor was illegally selling shares in the Key Bank claim, and that she maintained an office in Saco for that purpose; (2) Petit's lifestyle was not consistent with her alleged financial status; (3) Petit was making large payments to Gordon and others from sources that apparently were not questioned; (4) Paul Richard, Petit's chief confidant, was willing to remain incarcerated for months for contempt for refusing to turn over accounting records of HER, Inc., a company linked to his own and the Debtor's criminal activities. This list is not exhaustive—it is illustrative only. Gordon says that Petit had great answers for every question put to her, and that he believed everything she said [13] until the day she was arrested. Although Cathy Petit undeniably has a gift of gab, as evidenced by her ability to carry off such widespread fraud, a higher than average standard applies to Mr. Gordon, who had unlimited access to her financial affairs, as well as the sanctity of the attorney-client privilege. In the circumstances, Gordon clearly *should* have been alerted to or suspicious of all or much of what his client was up to, and to be in such denial about Petit's activities is not an option for Mr. Gordon in this case.

But as Mr. Boyajian also correctly points out, while there was little cash on hand, and when *nobody* was willing to represent the estate against Key Bank, Gordon alone stepped up and offered to serve without retainer, sending the important signal to Key Bank that the claim was not going to go away just for lack of representation. His efforts in this regard clearly did benefit the estate, and on this basis Gordon is entitled to be compensated. I am satisfied that without his efforts the offer probably would not have remained on the table, there likely would have been no settlement, and absolutely no dividend to unsecured creditors. Considering what other more passive professionals are receiving, and the relative benefit of their services to the estate, Gordon is entitled to something. The request for expenses, however, is another matter. Many of the items are for Petit's appeals, travel, deposition transcripts, photocopies, etc., and it has not been shown how *any* of the requested expenses were incurred on behalf of the estate. Accordingly, the expense part of the request is denied, and the application is approved in the amount of $50,000, *on account.*

13. Having seen Ms. Petit under oath, this Court is disappointed in Mr. Gordon's assessment of his client's credibility.

The last item for consideration is the request of John S. Campbell, Esq., and Campbell & Associates, P.A., f/k/a Poulos & Campbell, P.A. (hereinafter "Campbell"), for administrative expenses in the amount of $21,928 "pursuant to 11 U.S.C. §§ 503(b)(3)(B)[14] & (b)(3)(D)." The relevant Code sections state:

> After notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including—
>
> . . .
>
> (3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by-
>
> . . .
>
> (C) a creditor in connection with the prosecution of a criminal offense relating to the case or to the business or property of the debtor;
>
> (D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title . . . .

11 U.S.C. §§ 503(b)(3)(C) & (b)(3)(D).

Campbell was complaining early, often, and loudly that Petit was doing illicit things, he consistently opposed her efforts to remain in control of the Key Bank litigation, and persistently exposed her various Chapter 11 plans for what they were—a means to delay the case while she illegally peddled stock to the tune of $8 million dollars.[15] Immodestly, but fairly

accurately, Campbell states in his application:

> This creditor was instrumental in bringing to an end a pyramid scheme which has been described by Maine's United States Attorney as 'without question the single largest fraudulent scheme ever in the State of Maine.' . . .
>
> As a result of this creditor's action, the Bankruptcy Court postponed and eventually denied confirmation of the Debtor's Plan of Reorganization and an unfavorable settlement with Petit's closest associate, Mr. [Paul] Richard. . . .
>
> Upon the insistence of [Richard] Poulos, the Court ordered the Trustee to investigate the facts suggesting that this wrongful conduct was occurring. When that proved fruitless, Poulos took the matter to the FBI and the Untied States Attorney's Office.

Campbell Fee Application, Docket No. 679, pp. 17–18.

Creditors have the burden of establishing their entitlement to administrative expenses under Section 503(b), and such applications are carefully examined for the protection of other creditors. *See In re American Shipyard Corp.*, 220 B.R. 734, 738–39 (Bankr.D.R.I.1998); *In re Cole*, 189 B.R. 40, 47 (Bankr.S.D.N.Y.1995) (citations omitted). While Campbell did initially provide information to the Court and others which led to the investigation and criminal prosecution of the Debtor, it has not been shown how any part of this request comes within the scope of 11 U.S.C. § 503(b)(3)(C).

Under 503(b)(3)(D), however, Campbell clearly made a substantial contribution when the case was in Chapter 11, from

---

**14.** Campbell cites to 11 U.S.C. § 503(b)(3)(B)as one basis for his request, but in the application uses the language of Section 503(b)(3)(C). I will assume for the pur-pose of this ruling that (C) is the applicable Code section.

**15.** Unfortunately, these warnings were falling on many deaf or unreceptive ears.

February 11, 1994 to November 3, 1995, through his active and substantial involvement while the Debtor was urging plans that would have had her in control of the case. Campbell/Poulos were often alone in exposing the Debtor's actions and bringing her chicanery to light, and for this the Court is, and creditors and other applicants should be thankful.[16] During the Chapter 11 period Campbell incurred expenses of $6,713, and these are approved as administrative fees under 11 U.S.C. § 503(b)(3)(D).[17] In addition, for the reasons discussed above, Campbell is awarded an enhancement sufficient to bring his total compensation to $15,000, *on account.*

---

**16.** Poulos and Campbell, more than any other participant in these civil proceedings, heeded Judge Carter's May 8, 1995 admonition that "parties adverse to the Debtor ... take meaningful, aggressive, immediate, and effective action to bring the Debtor and her minions to heel in respect to disclosure...." *Petit v. New England Mortgage Servs. Inc. (In re Petit),* 182 B.R. 64, 72 (D.Me.1995).

**17.** While this section speaks to "the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection", it is not clear whether Campbell seeks compensation that would be more appropriately awarded under Section 503(b)(4). Since the objectors have not raised this issue, the allowance is made, as requested, under Section 503(b)(3)(D).