**In re IDAK CORPORATION, et al., Debtors.**

**Bankruptcy No. 79–1256–L.**

United States Bankruptcy Court, D. Massachusetts.

Dec. 30, 1982.

Richard S. Rosenstein, Goulston & Storrs, Boston, Mass., for Hillhaven of Massachusetts, Inc.

## MEMORANDUM DECISION RE APPLICATIONS FOR FINAL ALLOWANCES

THOMAS W. LAWLESS, Chief Judge.

On July 5, 1979, Idak Corporation and its subsidiary corporations (hereinafter collectively the "Debtors"), filed voluntary petitions for arrangements with creditors under Chapter XI of the Old Bankruptcy Act, 11 U.S.C. § 1 *et seq.* (prior to October 1, 1979). From the moment it began, it was apparent that these cases would require extraordinary attention by the Court and by the employed professionals.

The Debtors owned and operated 27 skilled nursing homes located throughout Massachusetts. The Debtors provided resident health care to over 2500 patients. There were over 2500 employees who depended upon the Debtors to support themselves and their families. Eventually, approximately $50 million in claims were asserted against the Debtors by approximately 1500 creditors, many of whom were separately represented by able and aggressive counsel.

At the time the petitions were filed the Debtors were without funds necessary to pay for the payroll, food and medicines necessary to sustain the continuation of health care to their patients. Medicaid payments which had been mailed by the Commonwealth were in danger of setoff. Several nursing homes were decertified by the State Health Department and various essential services were in danger of being shut off.

The Debtors' circumstances at filing required the Court to schedule several days of emergency hearings. The filings were widely reported in the newspapers and each of these hearings was well attended by the parties in interest. During the hearings, the integrity and competence of the Debtors' management was questioned. After the situation had been stabilized by Court actions, the Debtors themselves sought the appointment of Receivers who might assume day-to-day operating responsibility creating an umbrella or buffer within which the Debtors might be free to formulate a plan of arrangement.

The litigation storm which broke upon the filing of these cases set the weather pattern for several months thereafter.

Many of the secured creditors filed complaints for relief from the Bankruptcy Act stay. A major dispute between New England Merchants National Bank and the Debtors which concerned the construction, on a first impression basis, of the 1977 Medicaid Anti-Fraud And Abuse Amendments was extensively briefed and argued.[1] The Debtors' largest creditor, Burnac Mortgage Investors, Ltd., sought in several ways to force liquidation of the Debtors' assets and the Debtors challenged the validity and enforceability of Burnac's claims under various provisions of the Bankruptcy Act. The Massachusetts Department of Public Welfare asserted claims against the Debtors for more than $5 million, with priority status for half of these claims and the Debtors objected to such claims. Other disputes with various agencies of the Commonwealth involving licensing of the Debtors' facilities, current medicaid rates, and the impact of various rate setting regulations upon plan feasibility ripened into strenuously contested litigation.

While battles were being fought on a daily basis in the courtroom, the Receivers assumed responsibility for stablizing and improving the Debtors' operations. In carrying out their duties, the Receivers required the services of various professionals including co-counsel experienced in general bankruptcy administration and nursing home law, special counsel with expertise in Department of Health so-called "life-safety compliance" regulations, and accountants.

The cases and all the contested litigation were concluded by confirmation of a consolidated plan of arrangement on August 31, 1982, slightly more than three years after they began. Under the plan, the Debtors have been recapitalized by merger on a financially sound basis and will continue to provide employment and improved quality health care. The plan provides for the payment in cash or upon separately agreed terms of the finally determined amounts of all secured and priority claims. The distribution in cash and properties provided in the plan to general unsecured creditors was accepted by them by overwhelming majorities. Indeed, a significant payment (one half million dollars) was also provided to the Debtors' shareholders. These results were much better than the expectations of the Court and almost all observers at the beginning of these proceedings, and, in the opinion of this Court, such success could not have been achieved without the efforts of the professionals whose applications for final allowances are now to be considered.

## GENERAL STANDARDS

In making the awards which follow, this Court is mindful that these cases arise under the Old Bankruptcy Act wherein Rules 11–31 and 219 apply and that the so-called "principle of economy" set forth in *Massachusetts Mutual Life Insurance Company v. J.H. Brock,* 405 F.2d 429 (5th Cir.1968); *cert. denied,* 395 U.S. 906, 89 S.Ct. 1748, 23 L.Ed.2d 220 (1969) arguably retains some vitality. At the same time, however, this Court cannot ignore the fact that by enacting the Bankruptcy Code eight months *before* the commencement of these cases,[2] Congress declared that the principle of economy in awarding fees and expenses in bankruptcy cases was contrary to public policy. *See, e.g., Matter of Pac. Far East Lines, Inc.,* 458 F.Supp. 771, 775–76 (N.D. Cal.1978), *rev'd on other grounds,* 654 F.2d 664 (9th Cir.1981).

Similarly, this Court is mindful that the circumstances of these cases are distinct from those of cases in which the economy principle is usually applied in that the reduction in requested fees herein will not

1. While this matter was *sub judice,* counsel advised the Court that they were negotiating a settlement of this litigation to be incorporated into a plan of arrangement and requested that the Court defer decision. Although the Court had by the time of this request nearly completed work on the decision, in keeping with the Congressional purpose to encourage voluntary settlements between debtors and their creditors in arrangement proceedings, the Court deferred.

2. The Code was enacted into law on November 6, 1978, but its substantive provisions became generally effective on October 1, 1979.

benefit creditors. Whatever impact fee estimates made by the parties may have had upon plan negotiations, this Court established the Deposit for administration expenses. If Hillhaven of Massachusetts, Inc. (hereinafter "Hillhaven") determined that the estimated fees were in excess of the amount it was willing to pay it had the right to withdraw its sponsorship of the plan at the time the Deposit was set. By agreeing to the Deposit and objecting to the fees at this time, the Court recognizes that Hillhaven is merely attempting to reduce its maximum merger price, and its success, if any, will not increase the payments to creditors as it would in liquidating bankruptcy cases wherein the principle of economy was established. *Matter of Myers,* 4 B.R. 343 (Bkrtcy.M.D.Fla.1980).

■ However Hillhaven's motivation is discounted, this Court recognizes that it has an independent duty to examine the propriety and reasonableness of all fee requests. *In the Matter of Darke,* 18 B.R. 510 (Bkrtcy.E.D.Mich.1982). In doing so, the Court will apply the so-called "lodestar" approach articulated by the First Circuit in *Furtado v. Bishop,* 635 F.2d 915 (1st Cir. 1980).

## APPRAISAL FEES

During these proceedings it was necessary for the Court to appoint nine experienced appraisers to value the Debtors' properties located in different regions of the Commonwealth. These appraisals were required to evaluate the complaints brought by secured creditors for relief from the Bankruptcy Act stay and to assist the Court in making the best interests determination with regard to the plan of arrangement. Although most of the secured creditors complaints were settled in the plan, the Court believes that these appraisals were of assistance to the parties in negotiation of the terms of the plan with these creditors and in the settlement of numerous real estate tax disputes.

No objection has been raised by any party with regard to the applications by any of the appraisers.

■ If bankruptcy courts are to have ready access to appraisers and other experts not generally familiar with bankruptcy practice, such experts must be paid in accordance with their normal billing practices. Accordingly, the following final awards are hereby allowed:

| | FINAL AWARD | AMOUNT PREVIOUSLY PAID | BALANCE TO BE PAID |
|---|---|---|---|
| John Quincy | $ 14,250.00 fee<br>$ 80.00 expense | $ 0 | $14,250.00 fee<br> 80.00 exp. |
| Robert Noone | $ 10,800.00 fee | $5,400.00 | $ 5,400.00 fee |
| John E. O'Neill | $ 12,000.00 fee | $6,000.00 | $ 6,000.00 fee |
| Richard Dennis | $ 9,000.00 fee | $4,500.00 | $ 4,500.00 fee |
| Kathleen T. O'Connor | $ 8,400.00 fee | $4,200.00 | $ 4,200.00 fee |
| John Moore | $ 10,800.00 fee | $5,400.00 | $ 5,400.00 fee |
| George A. Fratteroli | $ 12,000.00 fee | $6,000.00 | $ 6,000.00 fee |
| Archibald Home | $ 12,000.00 fee | $6,000.00 | $ 6,000.00 fee |
| John Hewitt | $ 800.00 fee | $ 400.00 | $ 400.00 fee |

## SULLIVAN & WORCESTER, COUNSEL TO THE DEBTORS

The application seeking the largest amount in these cases is that submitted by Sullivan & Worcester, counsel to the Debtors for $722,636.52 in fee and $36,983.30 in reimbursement of out-of-pocket expenses. This application states that the base hourly rates charged by this firm have been increased by 30% to take account of the difficulties encountered in these cases and the success achieved.

■ In its written memorandum, Hillhaven asserts that it is inappropriate for this Court to consider a premium award in excess of base hourly rates. Hillhaven's Memorandum In Support of Its Objection To Claims dated December 1, 1982 at 12. This position is contrary to the position stated by Hillhaven's counsel at the hearing on these matters, and clearly erroneous as a matter of law. In cases where a successful arrangement or reorganization is achieved, it is well established to be within the discretion of the court to consider and award premium compensation in excess of base hourly charges under both the Old Bankruptcy Act and the present Bankruptcy Code. *In re Continental Investment Corporation*, No. 76–1158–MA, Memorandum and Order on Application for Final Allowances (D.Mass., January 12, 1982), *aff'd.* (1st Cir. 1982); *In re Warrior Drilling & Engineering, Co., Inc.*, 9 B.R. 841, 7 B.C.D. 618 (Bkrtcy.N.D.Ala.1981), modified on other grounds, D.C. 18 B.R. 684 (N.D.Ala.1981).

Hillhaven's principal objections to Sullivan & Worcester's application are: (i) that this application reflects an improper allocation of effort within Sullivan & Worcester between higher priced partners and lower priced junior attorneys; and (ii) that the application evidences a duplication of certain services by Sullivan & Worcester and co-counsel to the Receivers.

The primary attorney responsible for Sullivan & Worcester's efforts in these cases was Barry M. Portnoy. Although Mr. Portnoy is relatively young and has only been admitted to practice for about ten years, he has earned a considerable reputation in this District and beyond as a leading practitioner of bankruptcy and reorganization law. Within the knowledge of this Court, he has lectured on various aspects of bankruptcy law to members of the bar. He has been the attorney with lead responsibility in several of the largest cases ever filed in this District (including the cases now under consideration) and from published decisions it is apparent that he is similarly engaged beyond this District.

■ Hillhaven's objection that a large percentage of Mr. Portnoy's time devoted to these cases was time which should have been assigned to more junior, less expensive, attorneys is not supported by the record. Much of Mr. Portnoy's time was devoted to conferences and negotiations. Such meetings are the essential work of developing a successful plan, the Debtors' primary responsibility in cases such as these. *See e.g., In re International Horizons, Inc.*, 10 B.R. 895, 900 (Bkrtcy.N.D.Ga. 1980). Moreover, it is this Court's own observation that Mr. Portnoy played an effective role as lead trial counsel in many of the more complicated adversary proceedings brought during these cases while leaving to less senior attorneys responsibility for less complex litigation.

■ Hillhaven's objection that Sullivan & Worcester's efforts were duplicative of the services rendered by co-counsel to the Receivers is equally unfounded. There is a wide and substantial difference between duplication and coordination. The Receivers and the Debtors are different parties who had different interests and each of them was entitled to separate representation. The Receivers primary responsibility was to maintain the Debtors' operation and to preserve and enhance the assets for the protection of all parties in interest. The Debtors' primary task was to develop a successful plan of arrangement and they approached each issue in the case with a view to its impact on this task. Although it sometimes happened that counsel for the Debtors and counsel for the Receivers were on the same side of a particular issue, it frequently happened that their positions varied and, sometimes, they opposed each other.

Hillhaven's specific objection that there was duplicate efforts by counsel for the Debtors and counsel for Receivers with regard to the litigation with the Commonwealth is a misinterpretation of the history of these cases. There were at least five separate adversary proceedings involving the Commonwealth during these cases: (1) the Commonwealth's claims for over $5 mil-

lion and the Debtors' objection thereto; (2) the Commonwealth's objection to confirmation of a plan and the Debtors' counterclaim; (3) the litigation concerning the delicensing proceedings before the Department of Public Health; (4) the Commonwealth's attempts to set-off claimed medicaid over-payments from monies due to the Receivers for current medicaid; and (5) the Commonwealth's lawsuit against the Federal Secretary of Health and Human Services in which both the Receivers and the Debtors were named as defendants. The first three of these matters had a direct impact upon the feasibility of the Debtors' plan and Debtors' counsel assumed lead responsibility. The fourth matter principally concerned current operations and current cash flow, and Receivers' counsel was primarily responsible for the estates' position. In the fifth matter, both the Debtors and the Receivers were named defendants and counsel for both were properly involved.

■ Applying the lodestar approach to Sullivan & Worcester's application, I find that the time records submitted and my observation of the services performed justify the hourly rates requested before consideration of any premium adjustment.

The only evidence submitted at the hearing on final fees with regard to the reasonableness of Sullivan & Worcester's hourly rates in view of the time involved in the cases, the experience of the professionals and the customary fees in the community was submitted by Sullivan & Worcester and was unchallenged. Mr. Portnoy's time accounts for about half of the total fee requested by Sullivan & Worcester. During the period of these cases his hourly rates ranged from $95.00 to $150.00 and averaged $132.80. I find these rates to be in line with continuing inflation and Mr. Portnoy's rising reputation at the bar during the period of these cases. Generally, I find the Sullivan & Worcester hourly rates to be comparable to those recently awarded in this District. *See, e.g., Hew Corporation v. Tandy Corporation,* 480 F.Supp. 758 (D.Mass.1979); *In re Continental Investment Corporation, supra.*

As pointed out above, Sullivan & Worcester's application seeks a premium of 30% of all hourly charges. In determining whether an upward adjustment of the lodestar rates to be paid Sullivan & Worcester is appropriate, this Court has tried to consider the factors set forth in *Furtado.* Each of these factors indicates that some premium adjustment is merited.

■ Sullivan & Worcester was not general counsel to the Debtors prior to the arrangement proceedings. Although their fee application indicates that Sullivan & Worcester will bill Hillhaven directly for certain "clean-up" services after confirmation, the fact of Hillhaven's opposition to this application indicates that it is unlikely that Sullivan & Worcester will be retained on a continuing long term basis. Professional specialists who are brought into major complex matters on a one shot basis are generally entitled to premium compensation.

■ The time commitment required of Debtors' counsel in these cases was substantial. Although Hillhaven now questions whether Mr. Portnoy should have devoted 37% of all the Sullivan & Worcester time required in these cases, this Court's observation is that such a commitment was essential to the success of the Debtors' efforts in these cases. The more than 2100 hours which Mr. Portnoy devoted to these cases most likely constitute a commitment of approximately one third of his total professional time during the pendency of these cases and precluded his employment in other matters. Such a commitment merits some consideration of premium compensation. *See Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974).

■ At the time these cases commenced, the Debtors promised Sullivan & Worcester a retainer advance of $100,-000.00. Although this money was delivered in the form of a certified check prior to the filings which began these cases, the check was dishonored by the New England Merchants National Bank. When the Court ordered the funds represented by this check

restored to the Debtors' accounts they were not paid to Sullivan & Worcester but held in the Debtors' estates. All interim allowances paid during these proceedings were challenged or appealed by New England Merchants National Bank or others. Counsel for debtors in arrangement proceedings always run some risk that they will not be paid if the arrangement fails and their fees are subordinated to the costs of the liquidation proceedings. The circumstances of the present case made this risk loom larger than usual and Sullivan & Worcester is entitled to some premium because of such a contingency.

■ The primary reason which justifies a premium adjustment to Sullivan & Worcester in these cases are the amounts involved and the results obtained. It is apparent that the litigation conducted by Sullivan & Worcester was successfully concluded. Approximately $50 million in claims were finally settled under the plan for approximately $20 million. When the cases commenced it appeared very unlikely that unsecured creditors would receive any dividend. At the conclusion unsecured creditors received $550,000.00 in cash plus various properties and even the Debtors' shareholders received $500,000.00.

■ As the cases were approaching confirmation various actions were required by Debtors' counsel to retain Hillhaven's commitment to fund the plan. On one occasion, counsel for the Debtors and for Hillhaven approached the Court with an emergency application to transfer properties to Hillhaven prior to confirmation in order to retain the benefit of certain financing commitments. It was necessary for Sullivan & Worcester to research and draft complex documentation and to negotiate consents from various parties to effect this unusual transaction. At the time of this emergency hearing, Hillhaven represented to the Court that this transaction would result in savings to it of several million dollars, which savings were essential for it to proceed with the plan. By proceeding with the merger Hillhaven has obtained the benefit of Sullivan & Worcester's services on behalf of the

Debtors in this transaction and countless others. It would be inequitable for Hillhaven to now avoid payment for such services.

■ For all of the foregoing reasons, the Court concludes that these cases present circumstances where an upward adjustment to the lodestar is appropriate in determining the fee to be paid Sullivan & Worcester. I find that an upward adjustment of 30% is reasonable for all partner time, but no adjustment should be made to associate, paralegal or law clerk time as sought in the Sullivan & Worcester application. Accordingly, Sullivan & Worcester is awarded $656,548.92 in fee plus $36,983.30 in reimbursement of disbursements, of which amounts $239,500.00 in fee and $19,493.64 in reimbursement previously have been paid, leaving a balance due of $417,048.92 in fee and $17,489.68 in reimbursement to be paid. *See* Attachment A.

### JOSEPH W. BARTLETT AND J. JOSEPH MALONEY, RECEIVERS

The Receivers, Joseph W. Bartlett and J. Joseph Maloney have applied respectively for the following amounts; $32,450.00 in fee plus $1,650.48 in reimbursement, and $205,750.00 in fee and $4,594.17 in reimbursement.

Messrs. Bartlett and Maloney are both prominent, experienced and able attorneys whose work and reputations are familiar to this Court. There were selected for the jobs of Co-Receivers in these cases because of this Court's confidence in their abilities and reputations.

Two Receivers were appointed in these cases because the nature of the Debtors' businesses mandated that a responsible officer should always be available to handle life threatening emergencies which might arise during the administration of these cases and because the Court believed that the combined judgment of two experienced business practitioners might be required for major policy decisions. A review of these fee applications reveals that the Court's purposes were well served. Mr. Maloney served as the active Receiver in charge of day-to-day operations and decisions. The Debtors' personnel and other functionaries

such as counsel and accountants to the Receivers reported to Mr. Maloney on a regular basis and received policy direction from him. Mr. Bartlett filled in for Mr. Maloney in his absence and was available for consultation with him and counsel on all major policy issues which arose during these cases.

The only objections raised to these applications are that Mr. Maloney's time records indicate that he may have rendered some services which might have been performed by his counsel and that both Mr. Maloney and Mr. Bartlett seek compensation based upon the usual hourly rates charged for clients of their respective law firms.

■ In the course of arrangement proceedings under Chapter XI of the Bankruptcy Act, the line between legal services which should be performed by counsel and administrative services which should be performed by receivers often becomes blurred. Mr. Maloney is an able and experienced lawyer. He is also an able and experienced businessman who, within the knowledge of this Court, serves as chairman of a medium size bank in Boston and who has previously served as a receiver or trustee in several other bankruptcy cases, including a large nursing home case. This Court has no doubt that this combination of experience and ability was precisely what was required in these cases and contributed materially to their successful conclusion. In these circumstances whatever services may have been performed by Mr. Maloney which might be considered unauthorized are probably more than offset by a success factor which should be added to his fee. However, the Court does discern in the time records submitted by Mr. Maloney certain time spent on matters which involved strictly legal rather than administrative matters. In order to maintain the line between administrative and legal services, forty-six hours are deducted from the hours requested by this applicant. See In re Crutcher Transfer Line, Inc., 20 B.R. 705 (Bkrtcy.W. D.Ky.1982); In re Thibodeau, 20 B.R. 107 (Bkrtcy.D.Me., 1981).

■ The Bankruptcy Act itself provides little guidance with regard to the standards to be applied in setting Receivers' compensation other than to establish a percentage maximum based upon the gross size of the estate administered. Bankruptcy Act §§ 48(a)(1), 337(1).[3] Some cases dealing with receivers' compensation indicate that courts should be guided by the value of comparable services in commerce and industry. E.g., Matter of D.H. Overmyer Co., Inc., 3 B.R. 678 (Bkrtcy.S.D.N.Y., 1981).

■ In the present cases the compensation sought by Messrs. Bartlett and Maloney is the equivalent of $10,000.00 and § 65,000.00 per annum, respectively. Clearly, similar services are not available at these rates in the business community. At the same time, this Court recognizes that neither Mr. Bartlett nor Mr. Maloney was engaged full time at these cases. In these circumstances, I find that the fairest measure of compensation for the Receivers is to use their standard hourly rates and to award them the compensation and reimbursement sought in full. Cf. In re Continental Investment Corporation, supra. Accordingly, final compensation of $32,450.00 in fee plus $1,650.48 in reimbursement is awarded to Mr. Bartlett of which $18,500.00 in fee and $1,455.39 in reimbursement has previously been paid, leaving a balance due of $13,950.00 in fee and $195.09 in reimbursement, see Attachment B; and final compensation of $200,000.00 in fee and $4,594.17 in reimbursement is awarded to Mr. Maloney, of which $94,000.00 in fee and $3,381.64 in reimbursement previously have been paid, leaving a balance due of $106,-000.00 in fee and $1,212.53 in reimbursement. See Attachment C.

GASTON SNOW & ELY BARTLETT,
MOULTON & LOONEY,

DANIEL D. GALLAGHER

COUNSEL TO THE RECEIVERS

Gaston Snow & Ely Bartlett, Moulton & Looney, and Daniel D. Gallagher, counsel to

---

3. The Receivers' final report indicates that the total funds administered in these cases were in excess of $93,800,000. Accordingly, the maximum fee which may be paid to the Receivers in these cases is approximately $470,000.00.

the Receivers, have applied for final compensation as follows:

Gaston Snow & Ely
Bartlett . . . . . . . . . . . . . . . . . $ 694,480.75 fee
25,820.89 expense
Moulton & Looney . . . . . . . . . . $ 377,328.75 fee
19,579.99 expense
Daniel D. Gallagher . . . . . . . . . $ 165,960.00 fee
862.45 expense

The principal objection raised to the application of Gaston Snow & Ely Bartlett is the allegation that their services duplicated the efforts of other counsel, namely Sullivan & Worcester and Moulton & Looney. The alleged duplication with Sullivan & Worcester has previously been addressed. With regard to the alleged duplication with Moulton & Looney, this Court has carefully scrutinized the applications filed by Gaston Snow & Ely Bartlett and by Moulton & Looney, the objections filed by Hillhaven, and the responses to these objections. While the Court notes considerable evidence of coordination by co-counsel to the Receivers of the type which would be required in a major case requiring the services of multiple counsel, it can find no evidence of duplication. Except in those cases where it was necessary to transfer legal work from one of these firms to the other because the possibility developed that an attorney at Gaston Snow might become a witness in a matter, it appears that sincere and successful efforts were made by both firms to avoid any duplication.

■ While there is no evidence of duplication with respect to the work performed by co-counsel, upon examination of Gaston Snow's detailed statement of services rendered, there appears to be an inordinate amount of time spent in conferences amongst the various Gaston Snow associates working on this matter and/or time that is unrelated to any specific adversary proceeding or matter. While this result is often difficult to avoid in a large firm, I find that the amount of associate time expended on this case exceeded the bounds of reasonable efficiency and productivity. *Furtado v. Bishop, supra,* at 920. Accord-

ingly, I allow 5,600 hours of associate time out of the 6,156.15 hours requested.

■ Applying the *Furtado* standards to the services rendered by Gaston Snow & Ely Bartlett, I find that the hourly charges sought ranging from $35.00 to $165.00 per hour are appropriate for the services rendered.

The labor negotiations performed by Gaston Snow & Ely Bartlett for the Receivers is but one example of the services rendered which supports the Court's conclusion. Several of the Debtors' nursing homes were operated under collective bargaining agreements with several different labor unions which required renegotiation during the arrangement proceedings. Despite the Debtors' serious financial limitations and a history of past defaults under prior union agreements, attorneys at Gaston Snow & Ely Bartlett were able to negotiate new contracts on terms which this Court considers favorable to the Debtors. These contracts were generally approved by the Court without objection from any party in interest. And, upon confirmation, Hillhaven determined to accept responsibility for these contracts even after they were afforded a reasonable opportunity to reject them under Sections 313(1) and 357(2) of the Bankruptcy Act. Most of this work was competently performed by associate attorneys at relatively low rates with only occasional, as needed, supervision by senior attorneys within Gaston Snow & Ely Bartlett.

■ In fact, the Court is fully aware that partner time accounted for only 10% of Gaston Snow's total time in these cases. Gaston Snow should be commended for staffing these cases with associates and law clerks as this resulted in an average hourly rate for the firm's services of $64.20. The allocation of these services, however, did not relieve the three partners (who accounted for 9% of the total partner time) from the heavy responsibility presented by the potentially life-threatening nature of an employee strike or the set-off of the needed Medicaid payments. The high priority treatment afforded these matters by the

partners and the expeditious and efficient manner in which favorable results were reached facilitated the Receiver's rendition of quality health care to the patients of these homes. This expeditious treatment, the results achieved, and the length of these proceedings warrant an upward adjustment of the partner's weighted hourly rate of $101.49 to $125.00 per hour.

The tasks which were assigned to Gaston Snow & Ely Bartlett were within the scope of the usual work of a large corporate law firm and they were handled with competence and dispatch. If counsel do not receive appropriate compensation for such services in arrangement proceedings which are successfully concluded such as these, it is extremely unlikely that competent counsel can be attracted to practice in bankruptcy courts. Accordingly, I have determined to award Gaston Snow & Ely Bartlett $695,-002.75 in fee and $25,820.88 in reimbursement, of which $287,000.00 in fee and $13,-000.00 in reimbursement previously have been paid, leaving a balance due of $408,-002.75 fee and $12,820.88 in reimbursement. *See* Attachment D.

■ In addition to the alleged duplication discussed above, Hillhaven has objected to the application by Moulton & Looney on the ground that many of the services rendered were beyond the scope of their employment as counsel. As noted above, it is often difficult for the Court or counsel to draw firm lines between the responsibility of a receiver and his counsel in complex arrangement proceedings. At the same time, the Court's review of the time records incorporated into the application of Moulton & Looney reveals that a significant percentage of the time devoted to these cases by attorneys in this firm was devoted to consultation with the staff employed by the Receivers, considering operations policy questions and performing other services of an administrative nature which are not the usual work of counsel. For these reasons I

have determined to reduce the amount of requested hours sought by Moulton & Looney by fifteen percent (15%). *Matter of Braswell Motor Freight Lines, Inc.,* 630 F.2d. 348 (5th Cir.1980); *In re Auto-Train Corp.,* 15 B.R. 160 (Bkrtcy.D.C.1981).

■ After reduction by fifteen percent, I find that the hourly charges submitted by Moulton & Looney are in keeping with customary rates charged for similar services and are properly documented in accordance with the lodestar standards of *Furtado.* Accordingly, I award Moulton & Looney final compensation of $320,727.58 in fee and $19,579.99 in reimbursement, of which $175,500.00 in fee and $15,444.47 in reimbursement previously have been paid, and $145,227.58 in fee and $4,135.52 in reimbursement is due. *See* Attachment E.

■ Attorney Gallagher's application presents particularly difficult circumstances to the Court. Attorney Gallagher was appointed as special counsel to the Receivers by order of this Court dated August 14, 1979. The order of appointment specifically limits Mr. Gallagher's retainer to representation of the Receivers in matters affecting violations of the life-safety regulations of the Massachusetts Department of Public Health which impacted upon licensing and Medicaid certification of the Debtors' nursing homes. A review of the time records submitted by Mr. Gallagher reveals that he allowed his services to stray considerably beyond the scope of his retainer.

While this Court has no doubt that most, if not all, of the services rendered by Mr. Gallagher beyond the scope of his original retainer were of benefit to the Receivers, if this Court is to retain control over the administration of cases before it, services beyond those authorized can not be compensated. *In re J.M. Wells, Inc.,* 575 F.2d 329 (1st. Cir.1978); *In re Photon, Inc.,* —— B.R. ——, Memorandum Opinion dated June 29, 1982 (D.Mass.)[4]; *In re Rene Press, Inc.,* 23

---

4. As supplemented by the Court's December 20, 1982 Memorandum Decision Re Final Allowances And Order Re Motion For Reconsideration.

B.R. 381 (Bkrtcy.D.Mass.1982). Accordingly, Mr. Gallagher's requested compensation shall be reduced by one-third; and he is hereby awarded a final allowance of $110,640.00 in fee and $862.45 in reimbursement, of which $80,000.00 in fee and $498.45 in reimbursement were previously paid, leaving a balance due of $30,640.00 in fee and $364.30 in reimbursement. *See* Attachment F.

### KAYE, FIALKOW, RICHMOND & ROTHSTEIN,

### SILVERMAN & KUDISCH,

### COUNSEL TO THE CREDITORS' COMMITTEE

The law firms of Kaye, Fialkow, Richmond & Rothstein and of Silverman & Kudisch, co-counsel to the Creditors' Committee in these cases have applied for final compensation respectively as follows: $93,103.75 in fee plus $1,565.47 in reimbursement, and $41,760.00 in fee plus $60.32 in reimbursement.

 Applying the *Furtado* standards to the Kaye, Fialkow application, I find that the hourly charges claimed by this firm appear to be somewhat excessive in view of the nature of the services rendered, a significant portion of which seems to have consisted of reviewing various pleadings and correspondence originated by the Debtors' counsel or counsel to the Receivers. I find that the lodestar hourly rate should be reduced to $95.00 per hour from the requested $104.00 hourly rate.

Despite the aforesaid limitation, the results achieved in these cases for the unsecured creditors are significant. These results are, in a measure, the fruits of labors by attorneys at Kaye, Fialkow, Richmond & Rothstein. This Court is of the view that in the absence of a successful plan of arrangement unsecured creditors might have received considerably less than they are to receive under the plan. It takes at least as much talent for creditors' counsel to know when to urge acceptance of a plan as it does to oppose all reorganization efforts and such talent is deserving of recognition. Accordingly, Kaye, Fialkow, Richmond & Rothstein are awarded final compensation of $85,613.75 in fee plus $1,565.47 in reimbursement of which $17,000.00 fee plus $506.47 in reimbursement previously have been paid, leaving a balance due of $68,613.75 in fee plus $1,059.00 in reimbursement. *See* Attachment G.

 The application by Silverman & Kudisch reveals that a large percentage of the time devoted to these cases by attorneys at this firm was spent in reviewing pleadings and correspondence originated by others and in consultation with co-counsel, Kaye, Fialkow, Richmond & Rothstein. In the circumstances it is difficult to perceive much justification for these services to the estate and certainly no justification at the hourly rates sought. Applying the *Furtado* standards, final compensation equal to fifty percent (50%) of the amount sought is hereby awarded Silverman & Kudisch—$20,880.00 in fee plus $60.32 in reimbursement, of which $9,500.00 in fee plus $8.83 in reimbursement previously have been paid, leaving a balance due of $11,380.00 in fee plus $51.50 in reimbursement. *See* Attachment H.

### ATTORNEY HENRY FRIEDMAN

### SECRETARY TO THE CREDITORS' COMMITTEE

 Attorney Henry Friedman has applied for final compensation of $11,050.00 in fee and $437.67 in reimbursement for services rendered in these cases as secretary to the Creditors' Committee.

The work of Secretary to the Creditors' Committee is purely ministerial and does not justify compensation at normal attorney's hourly rates. In the circumstances of these cases, considering the success achieved and the efforts in fact devoted to

this task, I hereby award attorney Friedman final allowance of $7,000.00 fee plus $437.67 in reimbursement, of which $3,500.00 in fee plus $400.00 in reimbursement previously have been paid, leaving a balance due of $3,500.00 in fee plus $37.67 in reimbursement.

## MIRICK, O'CONNELL, DeMALLIE & LONGEE

### SPECIAL COUNSEL TO THE DEBTORS

■ Prior to the commencement of these arrangement proceedings the law firm of Mirick, O'Connell, DeMallie & Longee was general counsel to the Debtors. Early in these cases, this firm was appointed Special Counsel to the Debtors for the limited purpose of providing background information and documentation of the Debtors' status and affairs. These services were completed early in these cases and this firm was paid an interim allowance leaving a modest balance due. No objection has been raised to the confirmation of the prior award or to payment of the balance due, and this Court believes it is now appropriate that the interim award previously granted be confirmed and the balance paid. Accordingly, Mirick, O'Connell, DeMallie and Longee are hereby awarded a final allowance of $1,935.00 in fee and $66.85 in reimbursement of which $1,500.00 in fee and $66.85 in reimbursement previously have been paid, leaving a balance due of $435.00 in fee.

## JOHN H. KELLEHER AND COMPANY

### ACCOUNTANTS TO THE RECEIVERS

Kelleher and Company seek a final allowance of $197,516.40 in fee and $9,478.18 in reimbursement.

■ The application by Kelleher and Company lists the total time devoted to these cases in gross amount by professional, but it provides no description of any kind with respect to the services rendered, the need for the services or the results achieved. Every applicant for compensation has the burden of providing the court with a sufficient description of the services rendered to enable the court to determine the appropriateness of the fee requested. While some general descriptions may be sufficient for applications for interim compensation which are subject to reconsideration at the conclusion of a case, the summary description provided by Kelleher and Company in its application for final compensation herein is totally inadequate. *See Souza v. Southworth*, 564 F.2d 609 (1st Cir. 1977); *Matter of Hamilton Hardware Co., Inc.*, 11 B.R. 326 (Bkrtcy.E.D.Mich.1981).

Another possible problem with the application submitted by Kelleher and Company is highlighted by Hillhaven's objections. Hillhaven has alleged that no State or Federal income tax returns were filed during the period of the Debtors' receivership.

Kelleher and Company was appointed accountants to the Receivers by order of this Court dated December 10, 1979. This order was entered in response to an application by the Receivers dated November 26, 1979. This application specifically states that the function of Kelleher and Company was, in part, to "prepare tax returns." If, in fact, tax returns have not been prepared or filed, some explanation is required.

For the foregoing reasons, no final award to Kelleher and Company shall be made at this time. Kelleher and Company shall have 15 days from the date of this decision to submit a supplemental application for final allowances which describes in detail by date, hours, and description, the services rendered to the Receivers and which explains the need for the services and the benefits provided. This supplemental application shall also explain the status of the Debtors' tax filings at the time of plan confirmation. Hillhaven and any other party in interest who chooses to do so may file objections and memoranda in opposition to this supplemental application within 15 days of the date the supplemental applica-

tion is filed. Upon receipt of such papers, this Court will determine whether further hearing is necessary or if decision may be issued on the record.

## ATTORNEY JAMES L. RUDOLPH

## COMMITTEE OF NURSING HOME CONSULTANTS

■■■ Attorney Rudolph has applied for an allowance as counsel to a committee of nursing home consultants in the amount of $5,000.00 in fee plus $66.15 in reimbursement. It appears from the record of these cases that the formation of this committee or its retention of counsel was never authorized by this Court. In fact, this Applicant has not directed the Court's attention to any authority which would support such authorization in the circumstances of these cases. Accordingly, no compensation can be awarded to this Applicant. *In re J.M. Wells, Inc., supra; In re Rene Press, supra; In re Photon, supra.*

On March 4, 1982, the District Court remanded to this Court its decision granting interim allowances in these cases. The remand decision requires this Court to make specific findings on six separate issues as follows:

(1) the ability of the Debtors' estate to support the payments of interim fees from available assets;

(2) the long range financial status of the Debtors;

(3) the reasonableness of the fee requests;

(4) the effect of an award on the claims of Burnac and the Bank;

(5) the probability (or lack thereof) of a successful arrangement of the Debtors; and

(6) the amount, if any, of unnecessary, duplicative or unauthorized services for which compensation is sought.

The final confirmation of a successful plan in these cases has in large measure rendered the remand moot. However, in order to avoid any misunderstanding in this regard, this Court will briefly address each of the findings requested by the District Court:

(1) the ability of the Debtors' estate to support the payment of the fees awarded herein is established by the fact that an irrevocable letter of credit to cover such fees in an amount in excess of actual fee requests was posted with the Disbursing Agents at the time the plan of arrangement was confirmed.

(2) and (5) the long range prospects of the Debtors and the probability of a successful arrangement were established by the merger with Hillhaven and confirmation of the plan.

(3) and (6) the reasonableness of the fee requests and an examination of duplicative or unauthorized services are addressed above on an application by application basis.

(4) in the light of plan confirmation, the awards herein will have no effect upon Burnac or the Bank. Burnac's claim was settled in cash prior to confirmation. Under the plan the Bank of New England's claim remains unaffected and it has agreed to settle its claim on terms separately agreed upon with Hillhaven.

Attached hereto are summary schedules showing the lodestar calculations which have been performed by the Court to achieve the results set forth above.

Order entered December 20, 1982.