In re D.C. SULLIVAN & CO., INC., Bankrupt.

Bankruptcy No. 70–614–G.

United States Bankruptcy Court, D. Massachusetts.

Sept. 19, 1984.

See also, Bkrtcy., 69 B.R. 204.

Benjamin Goldman, Goldman & Goldman, Daniel F. Featherston, Jr., Irving Widett, Mark Berman, Boston, Mass., for trustee Robert Robinson.

Robert Robinson, Widett, Slater & Goldman, Boston, Mass., trustee.

Edward I. Perkins, Needham, Mass., for creditors.

## MEMORANDUM AND ORDER ON FEE APPLICATIONS

PAUL W. GLENNON, Bankruptcy Judge.

Before the Court are the fee applications of counsel, for services rendered in connection with the suit entitled *Daniel M. Glosband* (later amended to Robert Robinson (successor trustee)) *as he is Trustee in Bankruptcy of the D.C. Sullivan & Co., Inc. v. Watts Detective Agency, Inc., Consolidated Service Corporation, Christopher P. Recklitis, Billy Otte, and Daniel Sullivan,* filed in the United States District Court for the District of Massachusetts, ("Watts litigation") Docket No. CA 70–1336N, on October 6, 1970.

### BACKGROUND

On May 22, 1970, an involuntary petition in bankruptcy was filed against D.C. Sullivan & Co., Inc. On the same day, the corporation was adjudicated a bankrupt pursuant to a consent to adjudication. On July 13, 1970, Daniel M. Glosband, Esq. ("Glosband") was elected the Trustee in Bankruptcy. On January 9, 1976 Glosband resigned and Robert Robinson, Esq. ("Robinson") was appointed successor Trustee. Glosband had been an associate in the firm of Widett & Kruger for many years prior to January 1976. Robinson was an associate in Widett & Kruger for many years prior to January 1976 and thereafter was an associate and partner with the successor firm of Widett & Widett, and then, with its successor firm of Widett, Slater & Goldman, up to the present time. Irving Widett, Esq. ("Widett") was a member of the first two firms until about 1976, but not of the third. Edward I. Perkins, Esq., ("Perkins") (who had been counsel to the petitioning creditors) and the firm of Widett & Kruger were appointed general co-counsel

to the Trustee in Bankruptcy on July 16, 1970.

On the request of the Trustee, filed July 31, 1970, an order was entered that same day which authorized the employment of Goldman & Goldman as special counsel to the Trustee in Bankruptcy for the purpose of prosecuting the Watts litigation. The order further provided that "the compensation to be paid to the said law firms of Goldman and Goldman as special counsel, and Widett & Kruger and Edward I. Perkins as counsel for the Trustee, for assistance which they may render to special counsel in regard to the particular investigations and actions described above shall, exclusive of costs and expenses, be contingent upon a recovery from any of the actions instituted in accord with Paragraph 2 thereof, and shall be in an amount equal to thirty-three and one-third (33⅓) percent of the amount recovered from such actions." The firm of Goldman & Goldman was retained because of Benjamin Goldman's extensive experience in the trial of fraudulent conveyance actions and because of his familiarity with the facts of the subject case. Goldman proceeded to fashion the theory of the case, draft the complaint, and prepare the case for trial, with limited assistance from Widett.

In 1975, shortly before the case was to be called for trial, Hale and Dorr, counsel for the defendants, advised Benjamin Goldman that he would be called as a trial witness. Goldman thereupon conferred with the Trustee and they concluded that because Goldman had become a potential witness, it would be necessary to engage another attorney to try the case on behalf of the Trustee and that Goldman would work with that attorney.

Daniel F. Featherston, Jr., Esq. ("Featherston") agreed to try the case and commenced working on the case in September of 1975. The Trustee neglected to seek Court approval for Featherston's retention until May 14, 1982, when the Trustee filed an application for approval of Featherston's retention as special counsel *nunc pro tunc.* On this date, the Court entered

an order allowing the employment of Featherston as special counsel, *nunc pro tunc* to September 16, 1975. The order further provided that "the compensation to be paid to Daniel F. Featherston, Jr. as special counsel, in regard to his representation of the Trustee as described above, and in conjunction with the services rendered to the Trustee by special counsel, Benjamin Goldman, of the firm of Goldman and Goldman shall, exclusive of costs and expenses, be contingent upon a recovery in the action specified in Paragraph 2. hereof, and shall not increase the total attorneys fees which would then be awarded herein, but be a part thereof, all in accordance with the previous order of this Court, dated July 31, 1970." Unbeknownst to the Court, Goldman and Featherston had agreed to divide equally whatever fee Goldman would receive.

Through no fault of counsel, the case was not tried until March 1980. The jury returned verdicts for the plaintiff on two of the three counts. Post-trial motions were filed by both sides, and appeals taken by both sides and ultimately each side filed a petition in the United States Supreme Court for a writ of certiorari. While the petitions were pending in the Supreme Court, upon the motion of the parties to the litigation, this Court approved a compromise which provided that SCA Disposal Services of New England, Inc. ("SCA"), the successor in interest to some of the above-named defendants, would pay Robinson, as Trustee, $900,000 in full settlement and discharge of any and all claims. The $900,-000 was to be delivered to counsel to SCA and held in escrow by him in an interest-bearing account. Upon the approval by this Court of the compromise, the money held in escrow would be paid to Robinson, and the parties would individually with-

draw their petitions for writs of certiorari. The proceeds from the settlement are sufficient to pay all timely filed claims, possibly with substantial interest. Over the objection of Daniel C. Sullivan, an officer and director of SCA and a defendant in the Watts litigation, the Court approved the compromise on March 31, 1983. *See In re D.C. Sullivan & Co., Inc.,* No. 70–614–G slip op. (Bankr.D.Mass. Mar. 31, 1983).

Counsel to the Trustee have filed their fee requests. Interim fee awards were made on November 7, 1983: $75,000 to Featherston and $50,000 to Goldman.[1] Action on Perkins' application, lacking necessary details, was deferred, as were allowances for Robinson and Widett.

▇ The applications have now all been filed and the Court is prepared to enter final fee awards as to the Watts litigation.[2] The Court however feels it must first address the issue of the fee-sharing agreement entered into (but since repudiated) by Featherston and Goldman. Fee sharing agreements, outside of bankruptcy, are quite common, not necessarily improper and do not need court approval. The fee-sharing agreement was not brought to the Court's attention[3] until mid–1983; approximately one year after the application for approval of special counsel *nunc pro tunc* was allowed. There is no question that both parties performed valuable services in preparing for and prosecuting the Watts litigation. In making the fee awards set forth below the Court did not consider the terms of the fee-sharing agreement but instead followed the well-recognized guidelines employed by the courts of this Circuit. However, the problem of the fee-sharing agreement lingers and must be addressed.

Chief Justice Taft's opinion in the leading case of *Weil v. Neary* [278 U.S. 160,

---

**1.** Goldman appealed the interim fee award order. After hearing, the motion of Goldman for stay of the November 7, 1983 order was denied. The appeal of Goldman of the November 7, 1983 order was subsequently withdrawn on December 21, 1983.

**2.** There are two other matters outstanding—the claim of Benjamin Goldman, the claim of Capi-

tol Bank and Trust Company and the objections thereto—which will be addressed in a separate memorandum and order.

**3.** The Court first became aware of the agreement at or just prior to the hearing on the fee applications.

49 S.Ct. 144, 73 L.Ed. 243 (1929)], expounded the manifest dangers of sharing compensation. It was there also said that such agreements are not less reprehensible because in a particular case they may not have resulted in any clearly discernible harm to the estate or its creditors. It is the *potential* danger alone that makes them obnoxious. Any division of fees or other compensation represents, above all, an incentive for the applicant to claim a compensation high enough to make his own share in it a worth-while renumeration. It thereby tends toward extravagance of expenditure. Another evil is that it subjects the officer or attorney entitled to compensation to outside influences, over which the court has no control and which may affect the administration by depriving the court's functionaries of their requisite independence of judgment. Finally, it results in a clear transfer of judicial power over expenditure and allowances from the court to persons who, at best, have a distinctly lesser degree of public responsibilities.

The present Act rested the prohibition of "fee-splitting" on a broader basis. It incorporated the prohibition into the Act itself, instead of referring it to the General Orders. Now, under Rule 219(d) agreements for sharing fees and other compensation are prohibited if concluded with any person not contributing to the services to be compensated, except with law partners, regular associates of his legal firm and forwarding attorneys.

An attorney, accountant, custodian, receiver or trustee rendering services in connection with bankruptcy proceedings and who violates the statutory prohibition shall not be compensated. By making *lack of contribution* to the compensable services the crucial test, the statute opens itself to evasion by persons who in some way assist and contribute to the services of attorneys and other officers of the court. It is conceivable that such assistance be regarded as sufficient justification for sharing compensation. Such a construction would, however, consider-

ably jeopardize the effectiveness of the statutory prohibition. Fortunately, the safeguards now surrounding the employment of assistance, particularly the appointment of lawyers, offer little opportunity for assistance unauthorized by the court, yet if the statute is to fulfil [sic] its purpose the court will not only have to deny compensation out of the estate to unauthorized services, but will have to construe Rule 219(d) as requiring that services contributing to compensable services must have been *authorized by the court* before any agreement to share the compensation will be allowed to stand.

3A Collier on Bankruptcy ¶ 62.37 (14th ed. 1975) (footnotes omitted).

■ While the Court in no way condones the fee-sharing agreement of Goldman and Featherston, the Court believes it may compensate Featherston and Goldman for their services performed based on their contribution to the estate and in accordance with the cases set forth below. As respects the agreement, the specific employment of both attorneys was authorized by the Court. Further, this is not a case where either of these attorneys have been paid fees which, surreptitiously, they then shared between themselves. For these reasons, *inter alia*, the cases of *In re Futuronics Corp.*, 655 F.2d 463 (2d Cir.1981), *cert. denied*, 455 U.S. 941, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982) and In *In re Arlan's Department Stores, Inc.*, 615 F.2d 925 (2d Cir.1979) are distinguishable.

The Court now turns to the applications themselves. The factors which this Court must consider in making final fee awards are set forth in the case of *Furtado v. Bishop*, 635 F.2d 915 (1st Cir.1980). *See also, Grendel's Den, Inc. v. Larkin*, 582 F.Supp. 1220 (D.Mass.1984). While these factors were first enunciated in civil rights litigation, they have been consistently applied in this Circuit in bankruptcy proceedings. *See, e.g., In re Continental Investment Corp.*, 28 B.R. 972 (D.Mass.1982) and *In re Idak Corporation*, 26 B.R. 793 (Bankr.D.Mass.1982).

Essentially, the Court must conduct a two-step analysis fee requests. First, the Court must determine the appropriate "lodestar" or base fee. This is accomplished by multiplying the number of hours reasonably expended, by a reasonable hourly rate of compensation. In determining the appropriate "lodestar" amount, such factors as time and labor reasonably required, customary fees billed, fee awards in similar cases, the experience and skill of the personnel involved and whether, considering the difficulties presented, the level of commitment was appropriate. After the "lodestar" fee is determined, upward or downward adjustments of that fee may be made by consideration of factors "which have not *already* been taken into account in computing the 'lodestar' and which are shown to warrant the adjustment by the party proposing it." *Miles v. Sampson,* 675 F.2d 5, 8 (1st Cir.1982) (*quoted in In re Casco Bay Lines, Inc.,* 25 B.R. 747, 756 (Bankr. 1st Cir.1982)). Such factors may include the contingent nature of success and the delay in receipt of payment. *See Copeland v. Marshall,* 641 F.2d 880, 892 (D.C.Cir.1980).

 The "lodestar" may be further adjusted to reflect the "quality of representation." This adjustment is appropriate "only when the representation is unusually good or bad, taking into account the level of skill normally expected of an attorney commanding the hourly rate used to compute the 'lodestar'." *Id.* The bankruptcy court should evaluate the results of an attorney's representation in a bankruptcy proceeding and the resultant benefit to the estate, (i.e., "quality of representation") to determine if the situation warrants an adjustment of the "lodestar" amount. *In re Casco Bay Lines, Inc., supra,* at 756. *See also Copeland v. Marshall, supra,* at 894. Where an attorney's services have produced particularly exceptional benefits for the estate—taking into account the hourly rate commanded and the number of hours expended—an upward adjustment of the "lodestar" may be in order to correct an hourly rate that turned out to be overly conservative. Similarly, if a high-priced at-

torney performs in a competent but undistinguished manner, a decrease in the hourly rate would be warranted. *Id.*

I have considered the standards set forth in *Furtado* with regard to each applicant. The attorneys involved provided detailed accounts of the time spent on the Watts litigation in accordance with the practice in the bankruptcy court and the requirements of *Souza v. Southworth,* 564 F.2d 609 (1st Cir.1977) and *King v. Greenblatt,* 560 F.2d 1024 (1st Cir.1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978), except as otherwise noted below. Set forth below are brief descriptions of the Court's analysis. As a general matter, the Court notes that the Watts litigation involved novel questions of fact and law which were competently examined and presented by both Featherston and Goldman. The responsibility was divided by the attorneys, because of the potential conflict Goldman might have encountered. That is, while Goldman spent time on the Watts litigation after 1975, his work was different from or in conjunction with Featherston's services. I find little, if any, duplication.

Basically, the fraudulent conveyance action was brought in a "no asset" case. Complete details of the suit may be found at *Robinson v. Watts Detective Agency, Inc.,* 685 F.2d 729 (1st Cir.1982). This was a novel case in which the First Circuit ultimately held that at-will employees and customers were in the aggregate "property" which was fraudulently transferred.

*Benjamin Goldman*

 Benjamin Goldman spent 438⅓ hours over the course of thirteen years on services rendered in the Watts litigation. A little more than one third of the work was completed between 1970 and 1975. Using an average hourly rate of $175.00, I conclude that Goldman is entitled to receive $74,957.75 plus $1,671.84 as reimbursement of expenses. The $50,000 interim award is confirmed and the Trustee is directed to transmit the difference forthwith. The Court believes the rate of $175.00 per hour

is justified under the circumstances. Goldman is seventy-eight years old, a graduate of Harvard College and Harvard Law School, and has been actively practicing law for fifty-five years. He has had considerable trial experience in both state and federal courts and while his particular contributions were related mostly to the pre-trial aspects of the Watts litigation (including preliminary investigations, examinations and conferences, drafting the complaint, interrogatories and statement of agreed facts and research of the law) he conferred regularly with Featherston and worked on various post-trial matters.

### Daniel Featherston

■ Featherston and an associate employed by his office spent a total of 1661.15 hours from 1975 to 1983 on services in connection with the Watts litigation. The Court concludes that the associate's hourly rate was reasonable ($40 for 1975–1980 and $50 from 1981–1983). Through 1980, Featherston's hourly rate was also reasonable ($90–$175). The Court however believes that $200 in 1981 and $250 in 1982 and 1983 is unreasonable and accordingly will reduce Featherston's request by $25/hour in 1981, $50/hour in 1982 and $75/hour in 1983. Besides the fact that the hourly rates themselves are high, the services performed by Featherston during these later years were either largely of an administrative nature or were rehashes of prior work, e.g., on briefs. Accordingly, Featherston is entitled to receive $194,-690.00 for his services and $3,950.75 for reimbursement of expenses. The $75,000 interim award is confirmed and the Trustee is directed to transmit the difference forthwith. Featherston participated in numerous pre-trial and post-trial out-of court conferences, argued motions before the District Court and tried the case which continued for six days. Extensive legal research was performed by him or an associate from his office. Additionally, Featherston was involved in lengthy post-trial matters.

### Irving Widett et al.

■ I have deleted[4] from my calculations, services which were part of general counsel's duty to monitor the case and which did not contribute directly to the Watts litigation. I have also deleted items which simply were too indefinite to evaluate, e.g., "telephone conference with Benjamin Goldman, Esq.". Also, I have used an hourly rate of $150.00 rather than $175.00 for Mr. Widett's services during the period 1970–1980, and $200.00 for the period 1980–1983. I have reduced Mr. Robinson's hourly rate for the year 1980 from $160 to $130. While the advice of Widett and Robinson was undoubtedly valuable, they had a limited role in the Watts litigation. As to Daniel Glosband, I find that only 6 hours of the time reported is attributable to legal services, as opposed to Trustee services, and directly contributed to the Watts litigation. The Lane C. Tyler services were deleted for indefiniteness. The Diane M. Caracci services were deleted because they were Trustee rather than legal duties. No breakdown was made between Watts litigation disbursements and other disbursements. Therefore, no reimbursements for expenses will be made until the close of the case. In accordance with the above, Irving

---

4. The work performed on the following dates by Widett were deleted: July 13, 14, 20, 22, 30, and 31, 1970; August 3, 13, and 14, 1970; September 29, 1970; March 26, 1971; April 1, 1971; May 26, 1971; November 2, 1971; January 27, 1972; February 3 and 4, 1972; March 14, 1973; March 6, 1974; August 28 and 29, 1975; September 4, 1975; February 27, 1976; March 27, 1979; March 19, 20 and 21, 1980; September 3, 1981; April 7, 1982; July 22, 1982; and April 4, 1983. The work performed on the following dates by Robinson was deleted: July 22, 1970; April 5, 1976; October 4, 1977; October 31, 1979; March 21, 1980; April 11 and 28, 1980; June 6 and 12, 1980; August 20, 1980; September 20, 1980; October 1, 1980; November 26, 1980; January 7, 1981; March 18, 1981; June 3, 5, 8 and 12, 1981; July 17, 1981; July 27, 1982; August 13, 1982, November 5 and 9, 1982; December 13, 23 and 27, 1982; January 27 and 28, 1983; April 15, 1983; May 9, 1983.
As to Guy Moss, the work performed on February 27, 1976 is deleted.

Widett *et al.*, shall be entitled to a total award of $30,838 in fees.

### Edward I. Perkins

I have reviewed the time sheets appended to Mr. Perkins' application and find that only four items thereon are in the nature of services rendered in the Watts litigation:

| | | |
|---|---|---|
| Jul 1970 | Conference with Attorney Goldman and Widett re: employment of special counsel to commence, a suit against Watts and other defendants by the Trustee to set aside a fraudulent conveyance. General discussion about th merits and facts of the proposed litigation. T/C with Ben Goldman re: examination of various witnesses and attendance at hearings. Letter to follow outlining the details. | 6.0 hours |
| Jul 1970 | Letter to Goldman with suggestions and offering my co-operation and assistance at trial. | 1.0 hours |
| Sept 1975 | Discussion with Goldman re: engaging Featherstone [sic] as special counsel. | .4 hours |
| 11, 12, 13, 14, 17, 18, 21 Mar 1980 | Case reached for trial before J. Nelson and a jury verdict for $750,000.00, 10 years interest to be added. | 24.0 hours |

The balance of the services represent performance of the duties of general counsel and did not particularly benefit the prosecution of the Watts litigation, *i.e.*, these services primarily involved the monitoring, by Perkins, of the Watts litigation. The time sheets identify services totalling 58.5 hours. In addition, Perkins requests compensation for 40 hours of work, performed by the late Richard H. Perkins and by Donald J. O'Bell who is now practicing in Texas. No time sheets, or comparable documentation, were submitted to support the request for compensation for the additional 40 hours. Perkins requests $17,700 for the 98.5 hours of professional services. This comes to an hourly rate of $180.00.

The Court cannot award compensation for undocumented services. Only 31.4 hours of the 58.5 which are documented are services in furtherance of the Watts litigation. An appropriate hourly rate for the type of services rendered in connection with the Watts litigation is $150. Accordingly, Perkins' fee in connection with the Watts litigation will be $4,710.00.